Henry Yeckes and Edythe Yeckes, et al. [1] v. Commissioner. Yeckes v. Commissioner
Docket Nos. 2781-64, 4066-65-4068-65.
United States Tax Court
T.C. Memo 1966-178; 1966 Tax Ct. Memo LEXIS 106; 25 T.C.M. (CCH) 924; T.C.M. (RIA) 66178; July 29, 1966
*106 Complete liquidations: 12-month period: Distribution of assets: Assets retained. - Gain on the sale of an apartment building in complete liquidation of a corporation was taxable to the corporation where it continued to receive payments on a purchase money mortgage received as part of the consideration for the sale and where it continued to maintain a bank account from which payments were made therefrom well beyond the statutory 12-month period. Taxable year of inclusion for the corporation's transferees determined. Additions to tax: Negligence penalty: Failure to file returns: Proof. - Since it appeared that the officers of a corporation in good faith believed that a purchase money mortgage had, for tax purposes, been constructively distributed to stockholders immediately after the sale of an apartment building on February 1, 1956, and on that basis concluded that the corporation's income for 1956 was more than offset by allowable deductions, and that it had no income for 1957, the negligence penalty and a penalty for failure to file returns were not assessed. Daniel S. Berman, for the petitioners. Marie L. Garibaldi, for the respondent. TANNENWALD
Memorandum Findings of Fact and *107 Opinion TANNENWALD, Judge: Respondent determined deficiencies in income tax and additions to tax for the years and in the amounts as follows: Additions to tax
Docket No.
Taxable period ended
Income tax
Sec. 6651(a) [2]
Sec. 6653(a)
4066-65
Dec. 31, 1956
$28,681.89
$7,170.47
$1,434.09
Feb. 28, 1957
362.06
90.52
18.10
4067-65
Dec. 31, 1956
28,681.89
7,170.47
1,434.09
Feb. 28, 1957
362.06
90.52
18.10
4068-65
Dec. 31, 1956
28,681.89
7,170.47
1,434.09
Feb. 28, 1957
362.06
90.52
18.10
2781-64
Dec. 31, 1957
7,375.56
0
0
Docket No. 4066-65 involves a deficiency asserted against a dissolved corporation. Docket Nos. 4067-65 and 4068-65 involve respondent's assertion of transferee liability against two of the stockholders of the Corporation. [3] Docket No. 2781-64 involves the assertion of direct income tax liability of one of the stockholders based upon a determination that the stockholder realized gain from the liquidation of the Corporation in 1957. The issues remaining for decision are: (1) Did the Corporation satisfy the requirement of section 337(a) that all of its *108 assets be distributed within twelve months of the adoption of the plan of complete liquidation? (2) Did the Corporation realize income in 1956 and 1957? (3) Is the Corporation liable for the additions to tax (a) for failure to file returns as provided in section 6651(a) and (b) for negligence under section 6653(a)? (4) Did petitioner Henry Yeckes receive a distribution of assets in liquidation in 1957 so as to give rise to taxable gain to him in that year? Findings of Fact Some of the facts have been stipulated and are found accordingly. The Madison 28th Corporation (hereinafter referred to as the "Corporation") was incorporated under the laws of New York in 1950. At all times since its incorporation, there have been three shares of stock issued and outstanding. Originally they were issued one each to Harry Turek, Henry Yeckes, and Max Schneider. Prior to the taxable years involved herein, Schneider assigned his share of stock to his wife, Grace. During January 1956, the Corporation received $4,900 as rental income from the property. On January 26, 1956, the assets of the Corporation consisted solely of cash and an apartment building at 75 Madison Avenue, New York City, together with *109 items related thereto, i.e., insurance policies. On January 26, 1956, a plan of dissolution and liquidation of the Corporation was adopted by the shareholders. On February 1, 1956, the corporation sold the apartment building for a gross sales price of $385,000. The parties have stipulated that the Corporation realized a profit of $114,630.08. The Corporation received cash of $88,000 and a purchase money mortgage of $98,394.92. [4] The cash received by the Corporation was used in part to discharge pre-existing corporate obligations, including an outstanding second mortgage. On February 15, 1956, cash distributions of $7,800 each were made to Dorothy Perkins Turek (the wife of Harry Turek), Henry Yeckes, and Grace Schneider. Through January 1957, the following payments of interest and principal on the mortgage were made by checks payable to the Corporation and deposited in the Corporation's bank account: Amount of
Princi-
Date
check
Interest
pal
Apr. 10, 1956
$1,844.91
$1,229.94
$614.97
Aug. 6, 1956
1,837.22
1,222.25
614.97
Nov. 16, 1956
1,829.53
1,214.56
614.97
Jan. 25, 1957 [5] *110 1,821.85
1,206.88
614.97
Each check was deposited in the Corporation's account at the Chemical Corn Exchange Bank, the last deposit being made on February 6, 1957. From and after the sale of February 1, 1956, the sole assets of the Corporation consisted of cash and the purchase money mortgage and the Corporation engaged in no business activity other than the payment of debts and the collection of payments on the mortgage. [6]
On January 24, 1957, there was a $263.27 credit in an account in the Corporation's *111 name at the Chemical Corn Exchange Bank and the purchase money mortgage still stood in the name of the Corporation. The mortgage had a stipulated value on that date of $95,935.04. [7]
On January 24, 1957, the Corporation filed a Certificate of Dissolution with the New York Secretary of State, who on the same day certified that the Corporation "is dissolved." On February 5, 1957, the Corporation issued the following checks: Date of bank
Payee
Amount
clearance [8]
Henry Yeckes
$607.28
Feb. 7, 1957
Grace Schneider
607.28
Mar. 7, 1957
Dorothy Perkins Turek
607.29
Mar. 14, 1957
On January 1, 1957, a payment of $1,000 for an unidentified purpose was debited to the Corporation's bank account. On February 13, 1957 and February 14, 1957, payments in the amounts of $150 and $35.50, respectively, for unidentified purposes were *112 debited to the account. On December 27, 1957, a payment in the amount of $25 for an unidentified purpose was similarly debited. On November 7, 1958, the account was closed out through an unidentified payment of $52.77. Other than the transactions herein found, the Corporation's bank account had no activity between January 1, 1957 and November 7, 1958. On February 15, 1957, the New York State Tax Commission assessed a liquidating franchise tax in the amount of $2,596.47 against the Corporation. [9]
On February 28, 1957, the Corporation executed an assignment of the purchase money mortgage to Henry Yeckes, Grace Schneider, and Dorothy Perkins (the maiden name of Turek's wife) as tenants in common. Henry Yeckes (hereinafter referred to as "Yeckes") and his wife, Edythe Yeckes, filed their joint income tax returns for the years 1956 and 1957 with the district director of internal revenue, Brooklyn, New York. On the 1956 return, they reported capital gain of $18,527.22 arising out of the transactions involved herein. This amount *113 was arrived at by taking one-third of the total amount of principal received by the Corporation in 1956 from the sale of the apartment building (the $88,000 down payment plus three principal payments on the mortgage) and multiplying the same by.61864, a profit factor derived from dividing the profit to the Corporation[10] by the sum of the $88,000 down payment and $98,394.92, the original face amount of the purchase money mortgage. They also reported $4,771.08 on their 1956 return as capital gain from Yeckes' one-third share of the earned surplus of the Corporation up to the date the plan of dissolution was adopted (January 26, 1956). Also included in the Yeckes' 1956 return was the amount of $1,222.25, representing Yeckes' share of the three payments of interest on the mortgage during that year. On their 1957 return, the Yeckes included no capital gain from the transactions involved herein but did include $1,593.80, representing interest on the mortgage. They reported gross income of $31,910.61 for 1957. Respondent in his 90-day letters to *114 the Corporation and to Yeckes and Grace Schneider as transferees asserted that the Corporation should have filed returns for the calendar year 1956 and the period January 1 to February 28, 1957 and that it or the transferees owed deficiencies as set forth above. In computing the deficiency for 1956, respondent, in addition to the profit from the sale, included $4,900 of rents and $3,666.75 of interest, against which he allowed deductions of $8,485.51. For the period January 1 to February 28, 1957, respondent asserted that the Corporation had $1,206.88 interest income (represented by the payment on the mortgage in January 1957) with no off-setting deductions. In addition, respondent in his 90-day letter to the Yeckes asserted a separate deficiency based on the failure to include as long-term capital gain one-third of the value of the mortgage (stipulated at $95,935.04) plus one-third of $1,292.34 (representing the balance in the Corporation's bank account at the close of business on February 28, 1957). Respondent allowed $100 as the basis for Yeckes' stock but presumed that distributions were received in 1956 which absorbed this cost. Opinion I. The principal issue confronting us is *115 whether the Corporation complied with section 337(a), [11] and particularly the 12-month requirement of subsection (2) thereof, so as not to be taxable on profit from the sale of the apartment building. Certainly the Corporation's efforts in this regard were, to say the least, inept. We hold that they were also insufficient. We recognize that section 337 is rooted in a desire by the Congress "to avoid having the tax consequences * * * depend primarily on the formal manner in which transactions are arranged, thus causing a trap for the unwary." See Mountain Water Co. of La Crescenta, 35 T.C. 418, 428 (1960). At the same time the section is a specific *116 grant of an exemption from taxation. While this in and of itself does not require a grudging construction which would thwart the legislative purpose (see Bankers Trust Co. Et Al., Executors, 33 B.T.A. 746, 747 (1935)), it at least makes it incumbent on the taxpayer to show that he has substantially complied with its provisions. Cf. Commissioner v. Jacobson, 336 U.S. 28 (1949); White v. United States, 305 U.S. 281 (1938). We do not have before us a situation where all steps designed to liquidate the Corporation had been taken and the formal assignment of the purchase money mortgage inadvertently overlooked; at all times petitioners were fully aware of the advisability of assigning the mortgage before the expiration of the 12-month period and, indeed, affirmatively sought to do so. Here the inescapable facts are that the Corporation continued to maintain a bank account and to make payments therefrom well beyond the 12-month period. It continued similarly to receive payments on the purchase money mortgage. At no time prior to the execution of the assignment was the mortgagor notified that the Corporation was no longer the owner of the mortgage and that payments should be made directly *117 to the stockholders. The Corporation remained the record owner of the mortgage at least until February 28, 1957, [12] so that it retained the full right to bring suit for collection or foreclosure in the event of default. Under these circumstances, we cannot say that the requirements of section 337(a)(2) have been met. Petitioners seek to overcome the time gap by alternative assertions. First they contend that there was a distribution of the corporate assets within 12 months. They assert that, under New York law, the dissolution of the Corporation on January 24, 1957 constituted the directors of the Corporation trustees of the corporate assets for the benefit of the stockholders. Alternatively petitioners argue that, if the dissolution did not accomplish the distribution of assets for the purposes of section 337(a)(2), respondent's own rulings and regulations sanction the delayed distribution resulting from an alleged difficulty in determining whether Harry Turek or his wife, Dorothy Perkins Turek, was entitled to the assets represented by the share of stock *118 which originally had been issued to Harry. As to the first contention, we see no need for us to detail the somewhat checkered history of New York law regarding the trustee status of directors of a dissolved corporation. Compare Matter of Baldwin Trading Corporation, 8 N. Y. 2d 144, 168 N.E. 2d 383 (1960), with Central Union Trust Company of New York v. American Ry. Traffic Company, 198 App. Div. 303 (2nd Dept. 1921), 190 N. Y. Supp. 674; see N. Y. Business Corporation Law, sec. 1006(a)(1), effective September 1, 1963. The statutory provisions of New York law in effect during the years in question (section 29 of the General Corporation Law [13] and section 105 of the Stock Corporation Law [14] *120 ) by their very terms contemplate that, upon dissolution, a corporation continues in existence for the purpose of discharging its liabilities and "distributing its assets." [Emphasis supplied.] Subdivision 7 of section 105 requires that a copy of the certificate of dissolution be published at least once a week for two successive weeks, a requirement which in this case obviously could not have been satisfied within the 12-month period. The subdivision goes on to state that "after the publication, *119 such corporation by its board of directors shall proceed to adjust and wind up its business and affairs with power * * * to distribute the remainder of its assets among its stockholders." [Emphasis supplied.] We conclude that the filing of the certificate of dissolution did not automatically accomplish a "distribution" to the shareholders of the Corporation under New York law. We think that the New York authorities cited by petitioners [15] *121 deal with the question of the fiduciary relationship between the directors and stockholders rather than the question of passage of title to corporate assets. See Chambers v. Blickle Ford Sales, Inc., 313 F. 2d 252, 258 (C.A. 2, 1963). Moreover, it does not necessarily follow that the dissolution of a corporation or the expiration of its charter ipso facto constitutes a complete liquidation for purposes of the Federal income tax. Ochs v. United States, 305 F. 2d 844 (Ct. Cls. 1962); J. T. Hatfield, 32 B.T.A. 1 (1935); Frank Kell, 31 B.T.A. 212 (1934); Mrs. Grant Smith, 26 B.T.A. 1178 (1932); but cf. B. F. Joel, et al., 9 B.T.A. 1027 (1928); see 1 Mertens, Law of Federal Income Taxation, secs. 9.75-9.78, pp. 152-156.
We turn now to petitioner's alternative contention that section 1.337-2(b) of respondent's regulations [16] and certain of his rulings, [17] as well as Mountain Water Co. of La Crescenta, supra, display a policy of extending the benefits to those corporations which cannot effect a normal distribution of assets within the designated 12-month period. Petitioners allege that there was considerable difficulty in deciding to whom the corporation should distribute the interest represented by the share issued in Harry Turek's name. Harry Turek apparently was caught between *122 creditors (several judgments had been entered against him) and a wife with whom he was not always on the best terms. Apparently, during the 12-month period, the officers of the Corporation could not (or, in any event, did not) decide whether to assign the interest on the mortgage represented by the stock issued in Turek's name to Turek or his wife, Dorothy. Petitioners contend that not knowing whether to assign the interest in the mortgage to Harry or Dorothy is the same as not being able to locate a stockholder and that the Corporation therefore should be exempt from the 12-month limitation. Assuming without deciding that there were substantial difficulties as claimed by petitioners, [18] *124 we do not believe the situation falls within the ambit of the authorities dealing with the application of section 337 to liquidations involving dissenting stockholders or stockholders who cannot be located. In those situations, the corporations divested themselves of the assets by distributions in escrow to a third person. Petitioners have shown us no reason why the purchase money mortgage (either in toto or to the extent of the Turek interest) could not have been so assigned. [19] And, for the reasons *123 already stated, we do not think that the passive accession of the directors as liquidators meets the requirement of respondent's regulations of "a transfer to * * * [an] other person authorized by law." Section 1.337-2(b), Income Tax Regs. Nor do we think that Mountain Water Co. of La Crescenta, supra, provides any sustenance for petitioners. In that case, we emphasized that only "small amounts" were involved ($1,320 out of $497,630) and were constrained to hold that this constituted substantial compliance with section 337; a contrary decision would clearly have thwarted the legislative purpose. We also note that assignment in escrow would have obviated the problem of fragmentizing in order to provide sufficient assets to meet the liability for New York State franchise tax. [20] II In addition to the profit from the sale of the apartment building, respondent also determined that during 1956 the Corporation received $4,900 of rents and $3,666.75 of interest. As to the rental item, petitioner offered no proof and respondent's determination *125 is therefore sustained. As to the interest item, this is represented by three payments on the mortgage received by the Corporation on or about April 10, August 6, and November 16, 1956. While the Corporation apparently passed these payments on to the stockholders, [21] it does not follow that it is not taxable on these amounts. The Corporation continued in existence and the interest item is taxable to it. With respect to 1957, respondent determined that the $1,206.88 of interest represented by the mortgage payment in January 1957 was income to the Corporation. We agree with respondent. Whether this payment was received before or after the filing of the certificate of dissolution is immaterial, [22] for a dissolved corporation clearly continues to be a taxable entity. Section 1.6012-2(a)(2), Income Tax Regs. ; Hersloff v. United States, 310 F. 2d 947 (Ct. Cl. 1962), certiorari denied 373 U.S. 923. III With respect to the addition to tax for *126 failure to file a return under section 6651(a) and for negligence under section 6653(a), it appears that the officers of the Corporation in good faith believed that the purchase money mortgage had, for tax purposes, been constructively distributed to the stockholders immediately after the sale of the apartment building on February 1, 1956. On that basis, they concluded that the Corporation's income for 1956 was the $4,900, which was more than offset by allowable deductions, and that it had no income in 1957. While we have held that the Corporation was mistaken as to the nontaxability of the profit on the sale of the building and the interest payments on the purchase money mortgage, [23] *127 we think that the ultimate resolution of the legal questions involved was reasonably in doubt. The issues as to the imposition of the additions to tax are factual. We hold that the failure on the part of the Corporation to file returns was "due to reasonable cause and not due to willful neglect" within the meaning of section 6651(a) and that the underpayments of tax involved herein were not "due to negligence or intentional disregard of rules and regulations" within the meaning of section 6653(a). IV With respect to Yeckes' direct tax liability for 1957, the purchase money mortgage under the circumstances of this case was obviously received by him in 1957. No proof has been offered to dispute respondent's determination of a zero basis in Yeckes' share of stock or of the value of the distributions made to him of $32,409.13. Petitioners concede that, if the gain is taxable to Yeckes in 1957, the assessment was timely made. We accordingly sustain respondent. [24] *128 Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Madison 28th Corp., Docket No. 4066-65; Henry Yeckes, Docket No. 4067-65; and Grace Schneider, Docket No. 4068-65.↩
2. All references are to the Internal Revenue Code of 1954.↩
3. Petitioners have conceded their liability as transferees in the event we find that the Corporation is liable.↩
4. It appears that the remaining $198,605.58 of the sales price was represented by the unpaid balance of a first mortgage which the purchaser either assumed or took the property subject to.↩
5. The stipulation states generally that "[from] February 1, 1956 through January 24, 1957 the following payments * * * were deposited." Since the bank statement shows that the $1,821.85 check was not credited to the account until February 6, 1957, we are unable to explain the discrepancy between the January 24 and January 25 dates. Elsewhere in the stipulation of facts this item is referred to as "the January 25, 1957 payment."
6. These conclusions rest on the oral testimony. No supporting details such as might have been contained in financial statements were submitted and the stipulation of facts reveals only transactions through the Corporation's bank account during the period January 1, 1957 through November 7, 1958.↩
7. The January payment had not been deposited, but the parties have apparently taken the amount of amortization represented by this payment into account in computing the value of the mortgage.↩
8. The parties have stipulated that the checks were received by the designated individuals on these dates but the evidence shows that they were debited to the Corporation's bank account on these dates.↩
9. The stipulation of facts specifies that the assessment was made on February 7, 1957, but the "Notice of Assessment and Receipt" (Ex. 6-F) is dated February 15, 1957.↩
10. The amount of profit utilized was $115,210.24. The discrepancy between this figure and the stipulated profit of $114,630.08 is not explained.↩
11. SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS. (a) General Rule. - If - (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period. [Emphasis added.]↩
12. It is not clear from the record whether the assignment was in fact recorded or, if recorded, the date on which this occurred.↩
13. N. Y. General Corporation Law: Sec. 29. Corporate existence to continue in case of dissolution; authority of directors. Upon the dissolution of a corporation for any cause and whether voluntary or involuntary its corporate existence shall continue for the purpose of paying, satisfying and discharging any existing liabilities or obligations, collecting and distributing its assets and doing all other acts required to adjust and wind up its business and affairs, and it may sue and be sued in its corporate name. * * * ↩
14. N. Y. Stock Corporation Law: Sec. 105. Dissolution without judicial proceedings. * * *
8. Such corporation shall continue for the purpose of paying, satisfying and discharging any existing liabilities or obligations, collecting and distributing its assets and doing all other acts required to adjust and wind up its business and affairs, and may sue and be sued in its corporate name.
15. Matter of Baldwin Trading Corporation, 8 N. Y. 2d 144, 168 N.E. 2d 383 (1960); Central Union Trust Company of New York v. American Ry. Traffic Company, 198 App. Div. 303 (2nd Dept. 1921), 190 N. Y. Supp. 674; Matter of Friedman, 177 App. Div. 755 (1st Dept. 1917), 164 N. Y. Supp. 892; Matter of Herb's Estate, 163 Misc. 441 (Surr. Ct. N. Y. County, 1937), 296 N. Y. Supp. 491. The latter two cases deal with the construction of wills and an ascertainment of decedent's intent rather than the question of actual title.
16. The regulations provide in part as follows: * * * If it is established to the satisfaction of the Commissioner that there are shareholders who cannot be located, a distribution in liquidation includes a transfer to a State official, trustee, or other person authorized by law to receive distributions for the benefit of such shareholders. [Sec. 1.337-2(b), Income Tax Regs.↩] 17. Rev. Rul. 63-245, 1963-2 C.B. 144; Rev. Rul. 57-140, 1957-1 C.B. 118; Rev. Rul. 65-257, 1965-2 C.B. 89↩.
18. The stock books of the Corporation were never changed to reflect any transfer from Harry to Dorothy. We note, however, that at least two distributions, one of $7,800 in 1956 and one of $607.29 in 1957, were made to Dorothy, that Dorothy was listed as a shareholder in the Inter-Bureau Information Report dated 12/27/56 and submitted to the New York Income Tax Bureau by the Corporation Tax Bureau, and that in the reply in Docket Nos. 4067-65 and 4068-65 petitioners therein admitted the allegation in respondent's answer that the one share was owned by Dorothy after January 1, 1956. 19. Neither Turek nor his wife would have been required to sign any such document of transfer; it is significant that the formal assignment executed on February 28, 1957 bore only the signature of Henry Yeckes as President of the Corporation. Such an assignment would have fully protected the officers and directors of the Corporation against any claim by Turek or his wife. ↩
20. With respect to the liability for New York franchise tax, we note that under subdivision 6 of section 105 of the New York Stock Corporation Law the certificate of dissolution could not have been filed unless the consent of the State Tax Commission was endorsed thereon, and the testimony indicates that such consent was in fact given. This obviously simplified the problem of distribution.↩
21. See footnote 6, supra.↩
22. We have previously noted the discrepancy in the stipulation of facts as to this item. See footnote 5, supra. If the precise date of receipt were material, we would find that the payment was received on January 25, 1957.↩
23. The record discloses that Henry Yeckes and Grace Schneider both reported their share of the interest as taxable income in 1956 and 1957.
24. Petitioners assert that such a holding involves subjecting the profit on the sale of the apartment building to a triple tax. Clearly there is a double tax, but that is the inevitable consequence of our holding that section 337 is inapplicable. Commissioner v. Court Holding Co., 324 U.S. 331 (1945). The possibility of a triple tax arises from the fact that Yeckes reported a portion of the Corporation's profit and of the interest on the purchase money mortgage on his 1956 individual return. Conceivably he would be entitled to a refund, but that year is not before us. See section 1311, et seq. We note that Yeckes did not report any of such profit for 1957.